Chicago, Burlington and Quincy Railroad Co.

*v.*

William H. McLallen, Admr. etc.

84   109
24a 383
26a 119
26a 121
84   109.
52a 562

1. Negligence—*whether plaintiff's intestate was negligent.* Where the conductor of a wild or extra train of freight cars was ordered, by telegraph from the assistant superintendent, to leave a certain station and run to the next, ahead of a passenger train then due by the time table, and did attempt to do so, but was killed by the passenger train colliding with his train, it was *held,* that he had the right to expect that the passenger train was behind time, and was not guilty of such negligence as to preclude a recovery.

2. Same— *in railway company.* Where a railway company, through its proper agent, gave the conductor of a wild freight train orders to leave a certain station and run to the next ahead of a passenger train, and failed to notify the conductor of the passenger train of such fact, and restrain its speed, whereby a collision occurred, resulting in the death of the conductor of the freight train, this was held to be negligence on the part of the company.

3. Same—*right of employee to recover for negligence of co-employee.* The rule that a railway company is not responsible for an injury to an employee, resulting from the negligence of a co-employee with the party injured, and in the same line of business, has no application to a case where the party injured is a conductor obeying orders from the assistant superintendent, whose negligence produces the injury; as between the conductor and the company, the assistant superintendent is the representative of the company, and his orders and those of his assistants are those of the company.

4. Corporation—*railroad—rules and regulations.* A railway corporation has the lawful right to make reasonable rules for the conduct of its employees, and also for the conduct of passengers. Whether any given rule be reasonable, and therefore within the power of the corporation, or whether it be unreasonable, and therefore *ultra vires,* is a question of law for the court; but whether such rules are adequate for the safety of others, and the management of the trains, is a question of fact for the jury.

Appeal from the Circuit Court of Du Page county; the Hon. H. H. Cody, Judge, presiding.

Messrs. Dexter & Smith, and Mr. B. F. Parks, for the appellant.

Mr. J. C. Sherwin, and Mr. H. F. Vallette, for the appellee.

Mr. Justice Dickey delivered the opinion of the Court:

This was an action on the case, brought by appellee, against appellant, to recover damages for the benefit of the next of kin of deceased, for the loss of his life in a collision of trains upon appellant's road, which occurred on the 5th of August, 1873.

The declaration alleges, in different counts. and in several forms, that the death of Briggs was caused by the negligence of appellant. Appellant pleaded not guilty. The issue was tried by a jury, and found for appellee, and judgment was rendered against appellant for damages $4500, and for costs.

On the trial, divers exceptions were taken to the rulings of the court on questions relating to the competency of evidence offered. Exceptions were also taken to the rulings of the court, in giving and refusing instructions to the jury, and, after verdict, a motion for a new trial, made by appellant, was overruled, and appellant excepted. All the evidence is preserved in a bill of exceptions taken by appellant.

As a ground for reversing this judgment, it is insisted that it appears from the proofs that Briggs, the deceased, was guilty of negligence, which was the cause of his death, or which contributed to that result to such a degree as to forbid a recovery in this action. That question was fairly submitted to the jury, and they have found the facts against appellant. This finding must not be disturbed, unless it be clearly against the weight of the evidence.

Briggs was a conductor in the employment of appellant, and on that morning was in charge of a freight train of thirty-eight loaded cars, chiefly loaded with cattle. This was not

one of the regular trains mentioned on the time card, but was an extra train, commonly called a wild train, such as were run by special orders from the assistant superintendent.

At 4:37 A. M., on the 5th of August, 1873, Briggs, being at Aurora with his train, received an order saying: "Run to Chicago as a wild train. Keep fifteen minutes behind No. 46 until fog rises." No. 46, mentioned in this order, was a *regular* freight train mentioned on the time card. By the card, its regular time to leave Aurora was 3:15 A. M., its regular time to pass Naperville was 4 A. M., and its regular time to pass Downer's Grove was 4:35 A. M. It is nine miles from Aurora to Naperville, and seven and one-half miles from Naperville to Downer's Grove.

At the time Briggs received this order, 4:37 A. M., No. 46 was standing at Aurora, and was *then* an hour and twenty-two minutes behind time, and started from Aurora at 4:38, an hour and twenty-three minutes behind time. By the printed rules, a freight train may, when behind time, make up lost time, but must in no case run faster than one mile in four minutes, and there is no printed rule requiring a freight train to run faster than is called for by its card time. Briggs, under his order to keep fifteen minutes behind No. 46, had the right to assume that No. 46 would run at the rate of its card time. This would have brought No. 46 to Naperville in forty-five minutes after it left Aurora, that is to say at 5:23, and Briggs, of course, should, by his order, have reached Naperville at 5:38.

On the card was a passenger train due at Aurora at 5:12, and at Naperville at 5:32, and at Downer's Grove at 5:48. Briggs had the right to infer from his order that this passenger train was behind time and would not reach Naperville until after 5:38.

It is true, train No. 46 had the right, if it could, to make up time at speed not exceeding one mile in four minutes, and if it made this maximum speed on every mile, and spent no time at Naperville, it might reach Naperville at 5:14, and Downer's at 5:43.

This was possible, but not probable, for there was an up-grade out of Aurora liable to cause a delay of at least two minutes, and an up-grade going east out of Naperville, which usually caused a delay of from three to six minutes. It was not at all probable that train 46 could leave Naperville before 5:16. or reach Downer's before 5:50 to 5:52. and she could not be regarded as behind her time under her order if she had left Naperville at 5:23 and reached Downer's at 5:58.

It must be remembered that Briggs saw No. 46 leave Aurora at 4:38, and had heard nothing from that train since, and had no knowledge of her position, except what he was bound to take notice of from the rules and the time card. He had the right to assume, unless otherwise informed, that No. 46 was making her card time. If this had been so, No. 46 would have left Naperville at 5:23, and if Briggs kept less than fifteen minutes behind No. 46. he did so in violation of orders. He, therefore, could not properly, under his order received at Aurora, leave Naperville until 5:38. At 5:30, or soon thereafter, while at Naperville, he received another order, which ran thus: "Run to Downer's Grove ahead of No. 10."

To Briggs' mind this order in no manner modified his order to keep fifteen minutes behind No. 46. He had the right to assume that both orders could be obeyed. This last order did modify the printed rule which required him to keep off the track on the time of the passenger train No. 10. By the card, that train was due at Naperville at 5:32, and Briggs had backed in on a side track at that station to let No. 10 go by. This order to run to Downer's Grove ahead of No. 10 implied that No. 10 was behind, and so far behind that Briggs could safely proceed to Downer's, without violating any of his orders. or any of the rules, except those relating to his keeping out of the way of No. 10. He had the right to assume that this required no especial care, for his order indicated none. He had the right to assume that No. 46 had passed Naperville at her card speed, that was at 5:23, and that, hence, in the execution of his last order, he should leave Naperville at 5:38, and reach Downer's Grove at 6:13. He did leave Naperville

at 5:38, according to the testimony of Dean, the engineer of his train, and was run into by No. 10 not later than 5:49, at a point only six miles from Downer's Grove, and at a time when he had still 24 minutes to make that point. Upon this view of the case, he was not behind time at all when the collision occurred.

Let us now suppose that it was the duty of Briggs to assume that No. 46, being behind time, would make up lost time at the utmost speed possible under the rules. This would be at the rate of one mile in four minutes, remembering the delays incident to the up-grades in starting out from Aurora and from Naperville. On this basis No. 46 would pass Naperville at 5:16, and at 5:49 A. M. would be within half a mile of Downer's Grove, and Briggs, if only fifteen minutes behind No. 46, would be three and three-fourths miles in its rear, or four and one-fourth miles west of Downer's Grove. At that moment he was within a mile and three-fourths of that point, or, in other words, he was seven minutes behind the utmost speed which could have been attained under the rules. The printed rules allow five minutes for possible variations of watches, and common sense teaches that the maximum speed can not always be maintained. Under these circumstances, as to the finding of the jury acquitting Briggs of any considerable degree of negligence, we can not say that such finding was clearly against the weight of the evidence. It is true, that upon certain hypotheses, embracing some of these facts, but not all of them, certain experts say that it was his duty to have protected the rear of his train by torpedoes and otherwise. Under all the circumstances shown by the proofs, we do not think it was clearly shown that such was his duty.

It is conceded that the operator at Naperville did all his duty.

It is insisted that the collision was caused by want of due care on the part of Williams, the conductor of the passenger train.

He was behind at Naperville thirteen minutes. He had the right to make up that time by increased speed, unless ordered to do otherwise. He knew that wild trains were run

8—84th Ill.

by telegraph, by orders from the main office at Aurora, and that his right to the track was complete, unless otherwise ordered. He received no order on the subject. He did hear the operator at Naperville say that "Briggs had gone ahead," and that (as he understood the words) he left at 5:23. It was then 5:46. Briggs, by this information, had twenty-three minutes start. Allowing eight minutes for the first half mile, and four minutes for each succeeding mile, Briggs was at least four and one-fourth miles east of Naperville when No. 10 started. This, under the surroundings, the conductor of No. 10 had the right to assume, and at 5:49, when appellant claims the collision occurred, Williams, the conductor of the passenger train, had the right to suppose that Briggs was at least five miles east of Naperville, and three and one-half miles east of the place of collision. We find no cause to disturb the verdict upon the ground that the fault was that of Williams.

We think the evidence warranted the jury in coming to the conclusion that necessary prudence in such matters required that Briggs' train should not have been sent out from Naperville, under the circumstances, without the communication of an order to the passenger train regulating its speed so as to have insured safety against collision; that in this there was negligence on the part of the company in not having a rule requiring such an order in such exigency, or if this be a proper matter to be left to the care of the assistant superintendent, in such case it was want of prudence on the part of the assistant superintendent to order Briggs forward from Naperville, without making it certain that the passenger train had an order, in some mode, restraining its speed and regulating its movements, so as to guard, with certainty, against collision.

It was, at 5:30 A. M., known at the office of the assistant superintendent, at Aurora, that No. 46 had left Naperville at 5.16, and was under no obligation to reach Downer's before 5:51 A. M.

It was known that Briggs' train was running under orders to keep fifteen minutes behind No. 46, and therefore could not properly reach Downer's before six minutes after six.

It was known that No. 10 was at Aurora, eighteen minutes behind time, with full right to the road and the right to make up lost time without limit as to speed, and that the rate of thirty-six miles an hour for a passenger train, under such circumstances, was not unreasonable or unusual.

It was known at the Aurora office that, under these circumstances, to permit No. 10 to reach Downer's before six minutes after six would probably bring about a collision.

Under these circumstances, common prudence did require that it should be made *certain* that the conductor of No. 10 had, before he left Naperville, an *order*, in writing, notifying him of the condition of Briggs' train and the time when it left, and specially directing him to look out for Briggs' train and restrain the speed of his own train.

This was not done. A verbal message was telegraphed to the operator at Naperville to notify conductor of No. 10, "that Briggs had orders to go to Downer's ahead of him, on his time." This message was verbally given to the conductor of No. 10, as he passed Naperville, and as he understood the operator, he was informed that Briggs left Naperville at 5:23. He was told there, and it was true, that there were "no orders for him."

It seems more than probable that if the statement of the operator had been properly understood by the conductor of No. 10, the collision would have been avoided. The liability of mistakes in the delivery of messages by telegraph was known to the company. A rule was in force requiring all *orders* to be repeated back to the main office, and that the repetition should be approved and endorsed "O. K." before an order should be acted upon. We can not say that the jury were wrong in saying that a failure to send such an order, in this case, was culpable negligence. If so, the negligence consists in the failure of the company to make a rule requiring this in such cases, or the negligence was that of the assistant superintendent, to send such an order in the exercise of the discretion left in his hands in the absence of such a rule.

But it is insisted that the assistant superintendent and his assistants in his office are co-employees with the conductors in the business of running the trains, and hence, under the rule that the employer is not responsible for an injury to an employee resulting from the negligence of a co-employee with the party injured, and in the same line of business, no recovery can be had in this case.

We hold that this rule does not apply to this case. As between the conductor and the company, the assistant superintendent, to whose orders the trains are all subject, is the representative of the corporation. His orders to the conductor of a train are, essentially, the orders of the employer. This rule applies as well to all orders issued by his assistants in his office, and issued in his name. These orders were all signed in the name of Chappell, the assistant superintendent. If those intrusted by him with the management of the business of the corporation, by orders issued in his name, neglect to issue a necessary order, that is his neglect, and the negligence of the corporation.

It is insisted that the court below erred in refusing to instruct the jury that the orders and regulations of the corporation were sufficient to protect the trains in question from collision. The court did instruct, that the rules given in evidence were "reasonable and proper," but left the question of their adequacy or sufficiency to the jury.

In this, we think, there was no error. Such a corporation has the lawful right to make reasonable rules for the conduct of its employees, and also for the conduct of passengers. Whether any given rule be reasonable, and therefore within the power of the corporation, or whether it be unreasonable, and therefore *ultra vires*, is a question of law for the courts. But whether such rules are adequate for the safety of the management of trains, is a question of fact, and was properly left to the jury.

The judgment of the court below must be affirmed.

*Judgment affirmed.*