MORRISON v. SAN PEDRO L. A. & S. L. R. Co.

No. 1782. Decided February 12, 1907 (88 Pac. 998).

1. MASTER AND SERVANT — INJURIES TO SERVANT — RAILROADS — WHAT LAW GOVERNS.—Where a servant was injured in the operation of a railroad in the State of Nevada, whether he was barred from recovery on the ground that he was injured by the negligence of a fellow servant depended on the law of that State.

2. SAME — FELLOW SERVANTS — DEFINITION.—In the absence of some statute defining fellow servant, the test to be applied is whether the negligent act, which caused the injury, was a breach of a positive duty owing by the master to his servant, in which case the person performing the act is a vice principal, and not a fellow servant.[1]

---

[1] Merrill v. Oregon Short Line, 29 Utah 264, 81 Pac. 86, 110 Am. St. Rep. 695.

3. **Same — Rules — Promulgation — Enforcement.**—A railroad company operating a construction line owes an absolute duty to its servants, engaged in operating work trains over the same, not only to promulgate rules and issue orders for the running of such trains, but also to use reasonable care to see that the same are enforced.

4. **Same — Evidence.**—Defendant railroad company was engaged in constructing a railroad on which trains west of C. were operated under bulletin orders issued by defendant's trainmaster. An order was issued that all east-bound work trains should have right of way over west-bound trains between 12 o'clock noon and 12 o'clock midnight, and *vice versa* between 12 o'clock midnight and 12 o'clock noon. On the day of the accident plaintiff, as engineer, was running an extra east-bound train about sixty miles west of C., and at 1 o'clock p. m. his train, having the right of way under such orders, was run into by a west-bound train in charge of the trainmaster as foreman in charge of a crew of laborers. The latter train was run àt a high rate of speed on a crooked track through a rough and mountainous country, and no flagman was put out or any steps taken to protect plaintiff's east-bound train. *Held*, that the negligence of the trainmaster in permitting his train to be run in violation of the bulletin was negligence in his capacity as vice-principal, and not as plaintiff's fellow-servant, for which the railroad company was responsible.

Appeal from District Court, Third District; M. L. Ritchie, Judge.

Action by D. R. Morrison against the San Pedro, Los Angeles & Salt Lake Railroad Company and others. From a judgment for plaintiff against the named defendant, it appeals.

Affirmed.

*C. C. Whittemore, J. W. N. Whitecotton* and *Pennel Cherrington,* for appellant.

*Powers & Marioneaux* for respondent.

### appellant's points.

We contend that the man Branen, in any light in which the evidence in this case can be considered, was a fellow servant of the plaintiff, and that the court should have so

instructed the jury as requested by the appellant in its sixth request. If we are correct in this view, it follows that the court should have given defendant's first request for instructions, wherein it asked the court to charge the jury that the plaintiff was not entitled to recover against any of the defendants. (*Stephani v. Railroad,* 19 Utah 196; *Sartin v. Railroad,* 27 Utah 447.)

"*Prima facie* all who enter into the employ of a single master are engaged in a common service and are fellow-servants." And the burden of proving otherwise is on the plaintiff. (*Railroad v. Baugh,* 149 U. S. 368; 2 Labatt on Master and Servant, sec. 512; *Blessing v. Railroad,* 77 Mo. 410; *McGowan v. Railroad,* 61 Mo. 528.)   According to the decisions of the Supreme Court of the United States, regarding the doctrine of fellow-servants, Branen was the fellow-servant of the plaintiff. (*Railroad v. Baugh,* supra; *Railroad v. Hambly,* 154 U. S. 349, 38 Law Ed. 1009; *Railroad v. Peterson,* 162 U. S. 346, 40 Law Ed. 994; *Mining Co. v. Whelan,* 168 U. S. 86, 42 Law Ed. 390; *Railroad v. Conroy,* 175 U. S. 323, 44 Law Ed. 181; *Robertson v. Railroad,* 78 Ind. 77, 41 Am. Rep. 552; *Millsaps v. Louisville N. & T. R. Co.,* 69 Miss. 423; *Railroad v. Hoover,* 25 L. R. A. 710; *McGowan v. Railroad,* supra; *Blessing v. Railroad,* supra; *Harley v. Railroad,* 57 Fed. Rep. 144; *Sartin v. Railroad,* supra; *Stephani v. Railroad,* supra.)

### RESPONDENT'S POINTS.

The following cases established the doctrine overwhelmingly, that "A duty rests upon railroad companies to establish and promulgate, either by time tables or other suitable means, appropriate and sufficient rules and regulations for the safe running of their trains, and an employee who is charged with this duty is, with respect to its performance, a vice principal.   Consequently, it is held that a railroad employee who is vested with the control of the movement of trains is a vice principal, whether he be a train dispatcher, superintendent, or assistant superintendent, division super-

intendent, telegraph operator, or other employee." (12 Ency.
of Law [2 Ed.], p. 967, notes 4 and 5, and notes 1, 2, 3,
and 4, on page 968; *Crew v. Railroad,* 20 Fed. Rep. 87;
*Railroad v. Camp,* 65 Fed. 952; *Clyde v. Railroad,* 69 Fed.
673; *Railroad v. Barry,* 58 Ark. 198; *McKune v. Railroad,*
66 Cal. 302; *Darrigan v. Railroad,* 52 Conn. 285, 52 Am.
Rep. 590.)

To the point that the person charged with making rules
and regulations for the movements of trains—train dis-
patchers and train masters—exercise functions which are
part of the positive duties of the master, see the following
additional authorities:     *Palmer v. Railroad,* 2 Idaho 290,
13 Pac. 425; *Railroad v. Young,* 26 Ill. App. 115; *Rail-
road v. Lallen,* 84 Ill. 109; *Railroad v. Kanaley,* 39 Kas.
1; *Hunn v. Railroad,* 78 Mich. 513; *Hankins v. Railroad,*
142 N. Y. 416; *Slater v. Jewett,* 85 N. Y. 62, 39 Am. Rep.
627; *Sutherland v. Railroad,* 125 N. Y. 737; *Lewis v. Sei-
fert,* 116 Pa. St. 628, 2 Am. St. Rep. 631; *Haynes v. Rail-
road,* 3 Coldw. (Tenn.) 222; *Washburn v. Railroad,* 3
Head (Tenn.) 638, 75 Am. Dec. 784; *Hogan v. Rail-
road,* 40 W. Va. 436; *Phillips v. Railroad,* 64 Wis. 475;
*Smith v. Railroad,* 92 Mo. 359, 1 Am. St. Rep. 729 (this
Missouri case overrules the *Blessing Case,* 77 Mo. 410, cited
by appellant); *Railroad v. Frost,* 74 Fed. 965; *Railroad v.
Heck.* (Ind.), 50 N. E. 994 (this case criticises and over-
rules *Robertson v. Railroad,* 78 Ind. 77, cited in appellant's
brief); *Railroad v. Elliott,* 51 S. W. 1067, 102 Fed. 96;
*Felton v. Harberson,* 104 Fed. 737, 44 C. C. A. 188; *Rail-
road v. Mix,* 121 Fed. 476; *Brommer v. Railroad,* 54 Atl.
1092, 205 Pa. 432; *Railroad v. Holmes,* 136 Fed. 66.


### STATEMENT OF FACTS.

Respondent sued to recover damages for injuries received
in and about the face and head, destroying the sight of one
eye and greatly impairing the sight of the other, and other-
wise injuring and disfiguring him about the face, and other-
wise brusing and injuring him, which said injuries he be-
lieves to be permanent and lasting, and have and will in

the future bar and prevent him from following his usual occupation, that of engineer, and will render him unable to earn a livelihood for himself as theretofore, and will in the future cause him to suffer great pain and mental anguish; all of which he alleges to have been due to the negligence of the defendants while he was in their employ in the capacity of a locomotive engineer. The defendant the San Pedro Construction Company was never served with process in the action, and no appearance was ever made for it. A verdict of no cause of action was returned in favor of the defendant the Empire Construction Company under the instruction of the trial court, and a verdict and judgment rendered against the appellant, San Pedro, Los Angeles & Salt Lake Railroad Company, for damages in the sum of $7,000; and this appeal is prosecuted to reverse the said verdict and judgment.

The record discloses substantially the followings facts: The appellant was engaged in constructing a railroad from Caliente west in the state of Nevada. Between Caliente and Moapa, a distance of about 85 miles, there was a single track, with here and there turnouts and switches. The railroad was in process of construction between Caliente and Moapa, and west of Moapa. It was constantly necessary to run trains between Caliente and the west end of the road, as far as the work had progressed. The country through which the road was building was rough and mountainous, and the right of way lay through many deep canyons, and the curves were long and numerous. There were no regular hours for the movements of trains, with the exceptions of two regular trains each way every day. The trains being used for the transportation of workmen and material, known as "work train extras," moved east and west as the exigencies of the work required. About the 1st of March, 1904, the respondent went to work for appellant at Caliente, in the state of Nevada, in the capacity of locomotive engineer, and ran what was called a "work train" between various points west of Caliente, up to and until the 17th day of August, 1904, the date when he received the injuries complained of. From

Caliente west there was no system of telegraph or telephone, so that the trains engaged on the work of construction did not run with any regularity; and the only method of operating the trains was by bulletin orders, which were written out and delivered to the engineers and conductors of the various trains by an employee known as and who was a general foreman, or trainmaster. At the time when respondent first went to work at Caliente, and beyond, up till between the 1st and 15th of June, 1904, one McDermott issued those orders. Thereafter for about a month, John Conway issued and signed the bulletin orders; but after July 15, 1904, till the time of the collision, when respondent was injured, a man by the name of William Branen (W. F. Branen) issued all the bulletin orders regulating the running of work trains extra. Respecting these bulletin orders respondent testified that he remembered the first one issued by Branen was the annulment of all orders issued up to that time; and afterwards he received other bulletins, among them the following one: "Bulletin Order No. 3. Caliente, Nevada, July 18, 1904. All Concerned: Bulletin No. 3. In effect July 21, from Caliente to end of track. All previous bulletins are annulled. All work trains extra east-bound will have right of track over all west-bound work trains extra between 12 K. noon and 12 K. midnight. All work trains extra west-bound will have right of track over all work trains extra east-bound between 12 midnight and 12 o'clock noon. W. F. Branen, Trainmaster." On August 17, 1904, the respondent was running what was known as "work train extra 501," and left siding 60, which was 60 miles west of Caliente, at 1 o'clock p. m., for the purpose of taking an injured man, one of the laborers, to Caliente to the doctor. On the same day another train, known as "work train extra 636," had gone from Caliente west, a distance of 20 miles, where was camped a gang of laborers, which it picked up, and where the train was loaded with rock for use in construction work. The crew of this latter train consisted of the engineer, a fireman, and a conductor, and William Branen. After loading the train with rock, it went back east towards

Caliente, and stopped at a point about $2\frac{1}{2}$ miles west of Caliente. Branen directed the train crew to place the various cars. In the afternoon work train extra 636, bearing Branen and the other employees mention, went about 14 miles east of camp to bridge 7. It remained there about an hour; then went farther east to bridge 4. It remained there, standing on the main line, perhaps an hour and a half. When the train started west, towards camp, the entire crew got on. Branen got on at the east end of the train, but immediately walked to the west end, and there took a position on the platform of the caboose, where he remained while the train ran from bridge 4, from which place it started, until it arrived at bridge 10, where it collided with the train being run by the respondent towards Caliente. According to respondent's witnesses the train on which Branen was riding was running at the time of the collision 30 miles an hour; and according to appellant's witnesses it was running not more than 12 miles an hour.

These are substantially the facts as gleaned from the transcript and abstract, and, with the exception of the testimony of the witnesses as to the speed of the train (work train extra 636) at the time of the collision, there is no apparent conflict.

ERICKSON, District Judge, after stating the facts, delivered the opinion of the court.

Counsel for appellant have assigned a number of alleged errors; but in their brief, and also upon the oral argument of the case before this court, they rely chiefly for a reversal of the judgment upon an alleged error of the trial court, wherein said court instructed the jury that all the members of the train crew of 501, the train on which respondent was riding and the members of the train crew on the colliding train (636), with the single exception of William Brenen, were fellow servants of respondent, for whose negligence appellant was not liable in the action. The instruction complained of is as follows: "You are instructed that by the undisputed evidence in this case the accident in which the

plaintiff was injured occurred in the state of Nevada, and the plaintiff's right to recover in this action is to be determined by the law of that state; and the court further charges you that by the law of that state the plaintiff was a fellow servant of Conductor Heston, Fireman Hickey, and Brakemen Bond and Colvin, the members of the train crew of the train which the plaintiff was running at the time the collision occurred, and was also a fellow servant of Engineer Derham, Conductor Tooley, Fireman Obernalte, and Brakemen Webb and Sibley of the train which collided with the train run by plaintiff. If, therefore, you find from the evidence in this case that the plaintiff was injured, if at all, as the direct result of the negligence of one or of all of the fellow servants above named, without any negligence as hereinbefore defined on the part of the defendant, then the defendant is not liable in this action, and that it is your duty to find a verdict in favor of the defendant." The trial court, in instruction No. 10 given to the jury, said: "You are further instructed that, if you believe from the evidence that the defendant had committed to William Branen the duty of making and promulgating rules for the movements of its trains, then it was the duty of said William Branen to exercise a degree of care and diligence in enforcing any orders or rules he may have given proportionate to the danger which might result to any employee of the defendant from a failure to enforce such obedience; and if you believe from the evidence that he knew, prior to the accident and in time to avert the same by the exercise of his authority, that bulletin order No. 3 was being violated, or in the exercise of ordinary care on his part could have known in time to avert the accident that bulletin order No. 3 was being violated, and that such violation caused the collision in question, then, if you further believe that Morrison was injured while exercising ordinary care for his own safety, your verdict must be for the plaintiff." This clearly submitted to the jury the question as to the position occupied by Branen at the time of the collision of the two trains, whether he was a fellow servant of respondent or a vice principal of appellant. And evidently

counsel for appellant regard this as the decisive question in the case, for they say in their brief: "As we view the case, the errors alleged resolve themselves into the one question, viz., was Branen, at the time of the accident complained of, a fellow servant of the plaintiff?"

Counsel for respondent take the position "that the question involved cannot be resolved by determining simply whether or no Branen was a fellow servant of plaintiff at the time of the accident" and they make the contention that the law is settled beyond all controversy: "(1) There are certain primary duties devolving on the master, which he cannot delegate to any employee, so as to relieve himself from responsibility for negligence in their performance. (2) That one of those duties is to make and enforce rules and regulations which will promote the safety of his employees in all cases where the business cannot be conducted without such rules. [Here citing *Johnson v. Union Pacific* (Utah), 76 Pac. 1089, 67 L. R. A. 506; *Pool v. Southern Pacific,* 20 Utah 210, 58 Pac. 326; *Morrill v. Oregon Short Line* (Utah), 81 Pac. 85.] (3) That the circumstances that the person to whom the master has delegated the performance of his positive duty may, in respect to the performance of duties, be a fellow servant is of no consequence in a suit by an employee for an injury arising out of the neglect of such person to perform the positive duty of the master. [Here citing cases last above mentioned; also *Chicago Hair & Bristle Co. v. Mueller* (Ill.), 68 N. E. 51, and authorities there cited.]" The injury complained of was received in the state of Nevada, and it was admitted at the trial that the common law relating to fellow servants was in force, and no statute on the subject had been enacted in that state at the time of the receiving of the injury by respondent, so that the question of liability must be determined under the rules of the common law. Mr. Justice Peckman, in a very able opinion in the case of *Northern Pac. R. Co. v. Peterson,* 162 U. S. 346, 16 Sup. Ct. 843, 40 L. Ed. 994, says:

"The general rule is that those entering into the service of a common master become thereby engaged in a common service and are fellow servants, and *prima facie* the common master is not liable for negligence of one of his servants which has resulted in an injury to a fellow servant. There are, however, some duties which a master owes, as such, to a servant entering his employment. He owes the duty to provide such servant with a reasonably safe place to work in, having reference to the character of the employment in which the servant is engaged. . . . And it has been held in many of the States that the master owes the further duty of adopting and promulgating safe and proper rules for the conduct of his business, including the government of the machinery and the running of trains on a railroad track. If, instead of personally performing these obligations, the master engages another to do them for him, he is liable for the neglect of that other, which, in such case, is not the neglect of a fellowservant, no matter what his position as to other matters, but is the neglect of the master to do those things which it is the duty of the master to perform as such."

Mr. Justice Brewer, in the course of his opinion delivered in the case of *Baltimore & O. R. v. Baugh,* 149 U. S. 387, 13 Sup. Ct. 921, 37 L. Ed. 772, makes this comment:

"Therefore it will be seen that the question turns rather on the character of the act than on the relation of the employees to each other. If the act is one done in the discharge of some positive duty of the master to the servant, then the negligence in the act is the negligence of the master; but, if it be not one in the discharge of such positive duty, then there should be some personal wrong on the part of the employer before he is held liable."

Circuit Judge Taft, in the case of *Baltimore & O. R. Co. v. Camp,* 65 Fed. 959, 13 C. C. A. 239, uses this language:

"More than this, we do not doubt that a train dispatcher is a representative of the company, within the rule of the common law, as expounded by the Supreme Court of the United States in the case of *Railroad Co. v. Baugh,* 149 U. S. 369, 13 Sup. Ct. 914, 37 L. Ed. 772. He represents the company for two reasons: First, because he is *pro tempore* in supreme control of a distinct department of the company for his division; and, second, because the work which he is called upon to do is in the discharge of a positive duty owed by the company to its employees. Again, the railway company is bound to provide general rules and general time-tables for the reasonably safe operation of its railway system, and also rules applicable to all emergencies likely to arise. It is inevitable that at times, and in sudden exigencies, the general time-tables must be set aside. It then becomes the duty

of the company to construct a temporary time-table with such care and skill that it may be reasonably adapted to secure the operation of all the trains on the road without accident or injury to passenger or employee. The person who devises this temporary time-table for the company and issues telegraphic orders to carry it out is the train dispatcher. He acts, it is true, under certain rules; but he is intrusted with a wide discretion and absolute control. That he is the representative of the company, and not the fellow-servant of those required to obey his orders, is held by many courts." (12 A. & E. Enc. L. (2 Ed.), 967, notes 4, 5, and notes 1-4, page 968; *Hankins v. Railroad Co.*, 142 N. Y. 416, 37 N. E. 466, 25 L. R. A. 396, 40 Am. St. Rep. 616; *Dana v. Railroad Co.*, 92 N. Y. 639; *Darrigan v. Railroad Co.*, 52 Conn. 285, 52 Am. Rep. 590; *Lewis v. Seifert*, 116 Pa. 628, 11 Atl. 514, 2 Am. St. Rep. 631; *Hunn v. Railroad Co.*, 78 Mich. 513, 44 N. W. 502, 7 L. R. A. 500; *Railroad Co. v. Barry*, 58 Ark. 198, 23 S. W. 1097; *Railroad Co. v. McLallan*, 84 Ill. 109; *Smith v. Railroad Co.*, 92 Mo. 359, 4 S. W. 129, 1 Am. St. Rep. 729; *Washburn v. Railroad Co.*, 3 Head [Tenn.] 638, 75 Am. Dec. 784; *Railroad Co. v. Arispe*, 5 Tex. Civ. App. 611, 23 S. W. 928, 24 S. W. 33.)

In the *Hankins Case*, the court held that where a servant is injured by the negligent performance of an act or duty which the master, as such, is required to perform, the latter is liable, although the negligence was that of another servant to whom the performance of the act or duty was intrusted, and this without regard to the rank or title of the person guilty of the negligence.

"The master is not relieved from liability in such case by the fact that he has promulgated rules or regulations for the proper performance of the act or duty by his agent, which were disregarded by the latter. A train dispatcher in ordering the movements of railroad trains, performs a duty resting upon the railroad company; and, as to its employees, his acts are those of the company."

A train dispatcher is not relieved, nor does he relieve the company, by the promulgation of an order. He must at all times know and guard against possible changes. The evidence showed that Branen held the position of trainmaster for the appellant company; that he gave orders to respondent and other employees, and on the day in question he was acting as foreman and had charge and control of a gang of laborers employed on a work train known as "extra 636," in construction work; and that he held a position of superiority

to respondent and other employees of appellant. The mere fact that Branen engaged in some labor as a common workman did not, as a matter of law, make him any the less a vice principal. (*Pittsburg Bridge Co. v. Walker,* 170 Ill. 550, 48 N. E. 915; *Chicago & Alton R. Co. v. May,* 108 Ill. 288.) Associate Justice McKenna of the United States Supreme Court, in the case of *Santa Fe Pac. R. Co. v. Holmes* (decided May 21, 1906) 26 Sup. Ct. 676, 50 L. Ed. 1904, holds that

"The duty of the master to furnish safe places for employees to work in and safe appliances to work with is a continuing one, to be exercised wherever circumstances require it. While the duty of the master—in this case a railroad company—may be, and frequently is, discharged by one exercise, it may recur at any moment in keeping trains in safe relation."

The rule consonant with the analogies of the law, and which is supported by the vast preponderance of the common law authority, and which furnishes the safest guide in the majority of cases, is that

"The master's liabilty to one servant for the negligence of another in no wise depends upon comparative rank of the negligent servant. True, the master may be liable for negligence of a superior servant; but it is not because of his superior rank. It is because he is charged with the performance of one of the master's personal duties. If a servant is charged with the performance of one of the master's duties, then the master must answer for his negligence in the discharge of that duty; and it is immaterial whether the servant who is charged with, and fails in the performance of, the master's personal obligation, ranks above or below the servant who is injured. The test, then, which determines the master's liability, is the nature of the act in reference to which the negligence occurred. If the servant whose negligence caused the injury was at the time performing one of the master's duties to his servants, the master is liable. If, on the other hand, he was not performing a duty which the law imposes upon the master, the master is not liable." (12 A. & E. Ency. Law [2d Ed.] 933; also note 2, citing English and United States cases, both federal and state.)

As the facts appear in the record, the master had invested Branen with full authority over Morrison, an engineer, and all other engineers, as well as all conductors on the work trains west of Caliente, and to make rules and give orders

for the movement of the trains upon which they were employed. He exercised this authority in issuing bulletin order No. 3, prescribing the time when trains should have the right of way over the division of the road then being constructed by appellant. This duty, imposed upon and delegated to him, was in the nature of a positive and primary duty, and of such a character that the master could not be relieved from responsibility for the negligent performance of such duty by an employee.

But counsel for appellant contend "that there is no evidence in the case showing, or tending to show, that William F. Branen, the person who had issued bulletin order No. 3, had any authority whatever to enforce its observance, or to enforce the observance of any rule." To this contention counsel for respondent very pertinently reply that "it is without merit and begs the question." If anything was intended by the language just quoted from appellant's brief, it is intended to convey the impression that Branen had no authority to give any order to the conductor and engineer of work train extra 636, the one upon which he was riding when it collided with Morrison's train, extra 501. But this construction of the testimony it not warranted; for the testimony certainly tends to show, and the jury were authorized in finding, that Branen, at that very time, was filling the position of trainmaster, and that he was also acting as foreman of the laborers on that train that day. In other words, he was, to quote the language of respondent's brief, "intrusted with the duty of seeing that the trains did not collide with each other; and this was a continuing duty upon his part. It was his duty to issue an order for the purpose mentioned whenever the circumstances, to the mind of a prudent man, required it to be done. To say that the evidence does not show that he had any authority to enforce obedience to any order he may have given is to overlook the legal principle involved." In *Merrill v. Oregon Short Line*, 81 Pac. 86, 29 Utah 264, 110 Am. St. Rep. 695, we find this language used by the Supreme Court of this state:

32 Utah—7

"Independent of some statute defining fellow servant, . . . . the test established by the Supreme Court of the United States . . . . as to when negligence is that of the master or of a fellow servant is whether the negligent act is a breach of positive duty owing by the master to his servant. If it is, then negligence in the act is negligence in the master. . . . . It must be conceded that it is settled in law that among the primary and positive duties of the master, owing to his servant, is the one of using ordinary care to promulgate and enforce reasonable rules and regulations for the safety of his servants when the nature of the business or the work requires it, and that this duty is nondelegable."

"An employer does not discharge his whole duty by merely framing and promulgating proper rules for the conduct of his business and the guidance and control of his servants. He is also under the obligation of enforcing the rules in so far as that result can be attained by exercising a reasonably careful supervision over his business and his servants. In other words, a master's duty does not end with prescribing rules calculated to secure the safety of his employees. It is equally binding on him honestly and faithfully to require their observance." (Labatt, Mast. & Serv., section 214.)

When the master places a servant in a position where it becomes necessary for him to make rules or issue orders to his or its employees in carrying out the positive duties of the master, then such servant stands in the place of the master; and if the master could enforce obedience to such rules and orders the servant could do likewise, and it would be his duty to do so.

"Where reasonable rules adopted by the master for the government of the employees are brought to their knowledge, an implied undertaking to observe them enters into the contract of employment, and it is the duty of the servant to obey these rules." (20 A. & E. Enc. Law (2d Ed.) 105, and notes.)

If it is the duty of the servant to whom the order is given or rule promulgated to obey, it would seem that the master, or his representative, who issues the order and promulgates the rule, should be held even more strictly to a faithful observance thereof.

On behalf of the appellant it is further contended that "there is nothing in the record showing anything that Branen should or could have done to prevent the accident." The record shows the movements of the work train extra

636 during the day of the collision; that when it left bridge 4, where it had been standing for two hours in the afternoon, everybody got on it. This was about 4 o'clock. The track was straight for a mile; then it grew crooked from there west, passing through a rough and mountainous country, which obstructed the view. Branen was on the east end of the train when it started west, but immediately walked the entire length of the train and took a position at the west end of the caboose, on the front platform. The caboose was on the west end of the train, and the engine was in the middle of the train. The train had gone west about 3½ miles from bridge 4 when the collision occurred on the commencement of a curve at the west end of a bridge. There is a conflict in the testimony as to the rate of speed of the train No. 636 at the time of the collision; but no flagman was out to protect the train from any eastbound train that might be approaching from the west, and the jury were authorized to find that Branen, well knowing that the train was running in violation of bulletin order No. 3, issued by himself, without being flagged, did nothing to enforce the order, and that ordinary care exercised by Branen would have averted the collision; for, when he saw that the train crew of the train upon which he was riding was disregarding one of the rules which he had promulgated for the safety of the train crews, it was his duty to issue such further order as, under the circumstances, was necessary to protect any train that might be coming east in the belief that it would encounter no danger, by reason of bulletin order No. 3. He was vested with authority to do so, and the trainmen well knew that, and presumably would have obeyed him. This court, in the case of *Merrill v. Short Line,* supra, has decided that it is as much a primary duty of a railway company to use ordinary care to enforce rules as to promulgate them. "The doctrine which appellant here invokes—that the master's duty was performed when he promulgated rules, and used ordinary care in selecting men to enforce them—cannot obtain; for the care with respect to enforcing the rules is as much a primary and nondelegable duty as the one of promulgating rules, or of

furnishing a safe place or appliance." The jury might well have found that Branen did not do anything to compel compliance with bulletin order No. 3, and that there was great peril in the train upon which he was riding· proceeding westward at that time of day without the protection of a flag, because of the irregularity with which the trains were running on that division, and that therefore he was guilty of negligence for which the master is liable.

There are a number of exceptions to instructions given by the court, and the refusal of instructions asked by defendant; but, in view of what is hereinbefore stated, we do not deem it necessary to discuss these instructions in detail. The main objection made by appellant to these instructions is that they should have been made upon the theory that Branen and plaintiff were fellow servants. When the fact was found by the jury that it was Mr. Branen's duty to promulgate orders and rules for the operation of trains, then, as a matter of law, he represented the appellant in that· regard, and it became his duty, as a matter of law, to exercise ordinary care and diligence, commensurate with the danger of the service in enforcing the rules and orders promulgated by him. Whether· he exercised such care and diligence, under all the circumstances, was a question of fact for the jury; but the duty devolving on him was a question of law. The duty is imposed by law. Whether the duty has been met is a question of fact. The jury having, by their verdict, found that Branen was invested with authority to promulgate rules and orders in the conduct of a branch or department of appellant's business, constituted Branen the vice principal of appellant in that regard, and, as such, the duty devolving upon it had to be discharged by him; and the jury having farther determined that Branen did not discharge this duty, and that the injuries complained of were the result of the failure of Branen to do so, and that respondent was free from negligence, the appellant cannot escape liability for the injury sustained by respondent, occasioned by the negligence of its vice principal. It was the duty of appellant to promulgate, and to exercise reasonable diligence to enforce, rea-

sonable rules and orders, with a view of protecting and promoting the safety of its employees in the operation of its trains; and such duty the law imposes in respect to irregular, as well as regular, trains. (*Galveston, H. & S. A. R. Co. v. Smith,* 76 Tex. 611, 13 S. W. 562, 18 Am. St. Rep. 78; *Tedford v. Los Angeles Elec. Co.,* 54 L. R. A., note, page 94; *Lewis v. Seifert,* 116 Pa. 628, 11 Atl. 514, 2 Am. St. Rep. 631.)

Whether this duty has been met, of course, depends upon the facts and circumstances of the particular case on trial; and the jury having, by their verdict, declared that it was not met in this case, and there being no errors of law appearing from the record, the judgment should be, and accordingly is, affirmed, with costs.

McCARTY, C. J., and FRICK, J., concur.